GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARY BROWN and ESTRELLA EUGENIO, as individuals, on behalf of themselves, the general public, and those similarly situated,

Plaintiffs,

v.

CROCS, INC.; and CROCS RETAIL, LLC,

Defendants.

CASE NO.

CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT

JURY TRIAL DEMANDED

**TABLE OF CONTENTS**


INTRODUCTION ..... 1
THE PARTIES ..... 2
JURISDICTION AND VENUE ..... 3
FRAUDULENT CONCEALMEANT AND TOLLING ..... 4
SUBSTANTIVE ALLEGATIONS ..... 5
A. Defendants Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ..... 5
B. Defendants Falsely Informed Users That They Could Reject the Website's Use of Cookies. ..... 9
C. The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendants' Website. ..... 16
1. Facebook Cookies. ..... 16
2. TikTok Cookies. ..... 26
3. Taboola Cookies. ..... 33
4. Snapchat Cookies. ..... 39
5. LinkedIn Cookies. ..... 40
D. The Third Parties Intercept User Communications While in Transit. ..... 40
E. The Signaling and Addressing Information Intercepted by the Third Parties. ..... 44
F. The Private Communications Collected are Valuable. ..... 45
PLAINTIFFS' EXPERIENCES ..... 46
CLASS ALLEGATIONS ..... 53
CAUSES OF ACTION ..... 55
First Cause of Action: Invasion of Privacy ..... 55
Second Cause of Action: Intrusion Upon Seclusion ..... 57
Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ..... 59
Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ..... 62
Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation ..... 64
Sixth Cause of Action: Unjust Enrichment ..... 68
PRAYER FOR RELIEF ..... 69

Plaintiffs Mary Brown and Estrella Eugenio ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Crocs, Inc. and Crocs Retail, LLC ("Defendants" or "Crocs"). Plaintiffs' allegations against Defendants are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns egregious violations of consumer privacy and a breach of consumer trust in violation of California law. When consumers visit Defendants' ecommerce website (www.crocs.com, the "Website"), Defendants display to them a popup cookie consent banner. Defendants' cookie banner discloses that the Website uses cookies to, among other things, "share or make accessible [visitor] data to third parties, such as marketing vendors, social media companies, and research partners[,]" but expressly gives users the option to control how they are tracked and how their personal data is used. Defendants assure visitors that they can choose to adjust "your privacy choices" by clicking or selecting the link to do so, as shown in the following screenshot of the Website cookie consent banner:




2. Like most internet websites, Defendants designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendants affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3. Even after users elect to "Reject All" cookies, Defendants nonetheless caused multiple third parties—including Meta Platforms, Inc. (Facebook), TikTok USDS Joint Venture LLC (TikTok), Taboola, Inc., Snap Inc. (SnapChat), and LinkedIn Corporation (a subsidiary of

Microsoft Corp.)—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website (the "Third Parties").

4. Contrary to users' express rejection of cookies and tracking technologies on the Website, Defendants caused cookies, including the Third Parties' cookies, to be sent to Plaintiff and other visitors' browsers, stored on their devices, and intercepted by the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what the Website visitors sought to avoid when they clicked or selected the "Reject All" button on the Crocs Privacy Preferences window. Defendants falsely told Website users that they respected users' privacy choices and would refrain from tracking and data sharing when users rejected "All" cookies. Despite receiving clear notice of users' lack of consent, Defendants ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7. Plaintiff Mary Brown is, and was at all relevant times, an individual and resident of Concord, California. Plaintiff Brown intends to remain in California and makes her permanent home there.

8. Plaintiff Estrella Eugenio is, and was at all relevant times, an individual and resident of San Jose, California. Plaintiff Eugenio intends to remain in California and makes her permanent home there.

9. Defendant Crocs, Inc. is a Delaware corporation with its principal place of business in Broomfield, Colorado.

10. Defendant Crocs Retail, LLC is a Colorado limited liability company with its principal place of business in Broomfield, Colorado.

11. Defendant Crocs Retail, LLC is a subsidiary of Defendant Crocs, Inc. Crocs Retail, LLC owns and operates the Website through which the Crocs, Inc. markets and sells its products directly to consumers.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendants are citizens of different states.

13. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products and services provided to persons in the State of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California.

14. Further, the Private Communications and data that Defendants cause to be intercepted by Third Parties are routed through servers located in California.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

16. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## FRAUDULENT CONCEALMEANT AND TOLLING

17. The delayed discovery rule applies to Plaintiffs' and the Class members' claims. Plaintiffs and Class members were unaware that, despite declining or rejecting all unnecessary cookies in the Crocs Privacy Preferences window, Defendant nonetheless caused third-party cookies to be sent to their browsers, stored on their devices, and intercepted by the Third Parties along with their private user data. Plaintiffs and Class members could not reasonably have discovered this conduct at the time of their visits to the Website because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiffs' or Class members' experiences on the Website would have alerted a reasonable user that their selections were not being honored. Plaintiffs and Class members lacked the technical expertise and specialized tools necessary to determine whether the Website honored their opt-out selections or instead continued transmitting their data notwithstanding their selections. Plaintiffs did not discover Defendant's conduct until a later investigation revealed it.

18. On or about June 5, 2026, Plaintiff Brown notified Defendant that it was engaging in the conduct alleged herein, including causing third-party cookies and corresponding user data to be stored on consumers' devices and intercepted by third parties despite users' rejection of all unnecessary cookies. Despite this notice, Defendant did not disclose this conduct to users.

19. Despite exercising reasonable diligence, Plaintiffs and Class members were unaware of Defendant's conduct because Defendant affirmatively represented that users could decline or reject all unnecessary cookies in the Crocs Privacy Preferences window, while simultaneously concealing that such tracking would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiffs and Class members from discovering their claims earlier. These circumstances, including Defendant's concealment and misleading representations, warrant tolling of the statute of limitations.

## SUBSTANTIVE ALLEGATIONS

### A. Defendants Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.

20. Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

21. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

22. As a result, Defendants knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

23. Defendants voluntarily integrated "third-party resources" from the Third Parties into their Website programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendants' use of the third-party resources on the Website is done so pursuant to agreements between Defendants and those Third Parties.

24. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

25. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

26. A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com, analytics.tiktok.com, trc-events.taboola.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

27. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are intercepted by those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendants, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;
- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;
- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;
- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;
- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;
- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Website;
- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

28. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase

preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

29. Defendants design, market, distribute, and sell footwear and accessories under the Crocs brand, including clogs, sandals, shoes, and footwear accessories. Defendants also own and operate the Website, which allows visitors to, among other things, obtain information regarding Defendants' products, browse product offerings, search for products, view product details, select sizes, colors, styles, and other product options, locate retail stores, manage customer accounts, and purchase products. As users interact with the Website—including by entering information into forms, searching for products, viewing product details, selecting product options, clicking links, and navigating webpages—they communicate Private Communications to Defendants, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

30. Defendants chose to install or integrate their Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendants incorporate into their Website, or that Defendants cause to be loaded. Because Defendants control the Website's software code, and are capable of determining whether a user is accessing the Website from California, they have complete control over whether first-party and third-party cookies are placed on their California users' devices and/or intercepted by third parties.

31. Defendants explained the third-party cookies they used on their Website as follows in their Privacy Policy:

> **Information We Automatically Collect.**
>
> When you visit and interact with our Services, we or our third-party advertising and analytics partners and service providers may use a variety of technologies, such as cookies, tags, or scripts to collect information about your activity…
>
> **Cookies and Other Similar Technologies:** "Cookies" are text files that are placed on your browser by the websites that you visit to distinguish you from other users, make your site navigation more efficient, store your preferences, and improve functionality. Cookies are also used to deliver personalized ads to you.
>
> Third parties may set cookies (and other technologies, such as pixels, tags, and scripts) through the Services and combine information from these cookies (and other technologies) with information they collect from other sources for analytics and/or advertising purposes.[1]

**B. Defendants Falsely Informed Users That They Could Reject the Website's Use of Cookies.**

32. When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "We use technology on this site that collects data from and about you, which we and our vendors may use to provide, improve, and personalize our products and services, for analytics and marketing, to record site interactions and to fulfill your requests. We also may share or make accessible your data to third parties, such as marketing vendors, social media companies, and research partners. In some states, this may constitute 'targeted advertising,' 'selling,' or 'sharing' as defined by applicable laws." The banner then purported to provide users the opportunity to manage "your privacy choices" by clicking or selecting the link to do so, as shown in the following screenshot from the Website:


We use technology on this site that collects data from and about you, which we and our vendors may use to provide, improve, and personalize our products and services, for analytics and marketing, to record site interactions and to fulfill your requests. We also may share or make accessible your data to third parties, such as marketing vendors, social media companies, and research partners. In some states, this may constitute "targeted advertising," "selling," or "sharing" as defined by applicable laws. For more information, see our Privacy Policy and more information on your privacy choices.

33. Plaintiff and other Website users who clicked or selected the "your privacy choices" link were then directed to the Crocs Privacy Preferences window. There, Defendants further represented to Website users that, "When you visit any website, it may store or retrieve

[1] Crocs.com Privacy Policy (effective as of 5/12/2026) (available at https://www.crocs.com/customer-service/privacy-policy.html).

information on your browser, often by using a cookie, which is a small text file that is placed on your computer or mobile device when you visit a website. The information collected might be about you, your preferences or your device…Because we respect your right to privacy, you can choose not to allow some types of cookies. Click on the different category headings to find out more and change your default settings[.]"

34. In addition to the description of the Website's use of cookies, Defendants further described and defined the categories of cookies in use on their Website. Users could access and view these descriptions by clicking on the different category headings. The descriptions and definitions were as follows:

a. "Functional" cookies, also called "preference" cookies, are those "used to enhance the performance of the site and to remember information [users] have entered or choices [users] have made…"

b. "Analytics" cookies are those that "allow [Defendants] to count and recognize traffic sources so [Defendants] can measure the performance of [their] site."

c. "Advertising" cookies are those "set through [Defendants'] site by [their] advertising partners. [These cookies] may be used by those companies to build a profile of [user] interests and show [users] relevant adverts on other sites. They…are based on uniquely identifying [a user's] browser and internet device."

d. "Necessary" cookies are "Always Active" and "are necessary for the website to function and cannot be switched off in [Defendants'] systems."

35. Accompanying each category of cookies was a toggle button or setting that users could adjust to turn "Off" each category of cookies, except the "Necessary" cookies that were "Always Active" on the Website. Besides this, the Crocs Privacy Preferences window also included both "Reject All" and "Accept All" buttons, all of which is as shown in the following screenshots from the Website:


Crocs Privacy Preferences
Your Privacy
Necessary Always Active
Functional On
Analytics On
Advertising On
When you visit any website, it may store or retrieve information on your browser, often by using a cookie, which is a small text file that is placed on your computer or mobile device when you visit a website. The information collected might be about you, your preferences or your device, and is mostly used to make the site work as you expect it to. The information does not usually directly identify you, but it can give you a more personalized web experience.
Because we respect your right to privacy, you can choose not to allow some types of cookies. Click on the different category headings to find out more and change your default settings. However, blocking some types of cookies may impact your experience of the site and the services we are able to offer.
Reject All
Accept All
Save and Close


Crocs Privacy Preferences
Your Privacy
Necessary Always Active
Functional On
Analytics On
Advertising On
These cookies are necessary for the website to function and cannot be switched off in our systems. They are usually only set in response to actions made by you which amount to a request for services, such as setting your privacy preferences, logging in or filling in forms.
Reject All
Accept All
Save and Close


Crocs Privacy Preferences
Your Privacy
Necessary Always Active
Functional On
Analytics On
Advertising On
These are sometimes called "preference" cookies. During your visit to a website, cookies are used to enhance the performance of the site and to remember information you have entered or choices you have made (such as your language or region) but are non-essential to your use of the site. However, without these cookies, certain functionality may become unavailable.
Reject All
Accept All
Save and Close







36. Users, including Plaintiffs, who clicked or selected the "Reject All" button, thereby indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website, including all categories of Functional, Analytics, and Advertising cookies (other than those "Necessary" for the Website to function), could then continue to browse the Website, as the popup cookie consent banner and Crocs Privacy Preferences window disappeared after they clicked or selected the "Reject All" button (or after they adjusted the available toggle switches to reject each category of cookies, then confirmed their choices by clicking or selecting the "Save and Close" button).

37. Defendants' popup cookie consent banner and Crocs Privacy Preferences window led Plaintiffs, and all those Website users similarly situated, to believe that they declined

or rejected all cookies and tracking technologies, especially those used to "collect data from and about [users]…to provide, improve, and personalize [Defendants'] products and services, for analytics and marketing, [and] to record site interactions[.]" The banner and Privacy Preference window further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendants would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Reject All" cookies button.

38. Defendants' representations, however, were false. In truth, Defendants did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users clicked or selected the "Reject All" cookies button in the Privacy Preferences window, they provided notice to Defendants that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

39. Nevertheless, even after receiving that notice, Defendants caused third-party tracking cookies, including the Third Parties' cookies, to be placed on Website users' browsers and devices and/or intercepted by the Third Parties which enabled the Third Parties to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendants failed to prevent cookies from being intercepted by the Third Parties, enabling them to track user behavior and communications.

40. Some aspects of the operations of the Third-Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshot, obtained using one such tool, shows examples of Third-Party cookies

being transmitted from a Website user's device and browser to Third Parties even after the user clicked or selected the "Reject All" button on the Website's Crocs Privacy Preferences window.




| Name | Domain | Type | Cookies |
|---|---|---|---|
| wa/?medium=fetch&fmt=g | px.ads.linkedin.com | fetch | 9 |
| act | analytics.tiktok.com | ping | 2 |
| tr/?id=283061001901751&ev=Subscrib... | www.facebook.com | text/plain | 8 |
| trigger/?id=283061001901751&ev=Sub... | www.facebook.com | | 8 |
| consentreceipts | privacyportal.onetrust.com | preflight | 0 |
| events?uu=8d5474cb-db3c-a7f6-955... | c.contentsquare.net | ping | 0 |
| pageview?cw=1&happid=127020264&t... | c.contentsquare.net | xhr | 0 |
| pixel | b.applovin.com | ping | 0 |
| display?cvars=%7B%221%22%3A%5B... | c.contentsquare.net | xhr | 0 |
| p | tr.snapchat.com | ping | 1 |
| consentreceipts | privacyportal.onetrust.com | xhr | 0 |
| unip?en=pre_d_eng_tb&tos=40084&s... | trc-events.taboola.com | xhr | 3 |
| wa/?medium=fetch&fmt=g | px.ads.linkedin.com | fetch | 9 |
| act | analytics.tiktok.com | ping | 2 |
| events | logx.optimizely.com | xhr | 0 |
| events | logx.optimizely.com | xhr | 0 |
| tr/?id=283061001901751&ev=Subscrib... | www.facebook.com | text/plain | 8 |
| trigger/?id=283061001901751&ev=Sub... | www.facebook.com | | 8 |
| errors?v=15.225.1&pid=2117&pn=3&sn... | c.contentsquare.net | xhr | 0 |
| pixel | b.applovin.com | ping | 0 |
| events?uu=8d5474cb-db3c-a7f6-955... | c.contentsquare.net | ping | 0 |
| display?cvars=%7B%221%22%3A%5B... | c.contentsquare.net | ping | 0 |
| p | tr.snapchat.com | ping | 1 |
| pixel | b.applovin.com | ping | 0 |
| otSDKStub.js | cdn.cookielaw.org | script | 0 |
| afterpay-1.x.js | js.afterpay.com | script | 0 |
| gretel.min.js | cdn.cquotient.com | script | 0 |
| vcd15cbe7772f49c399c6a5babf22c12... | static.cloudflareinsights.com | script | 0 |
| datadog-rum.js | www.datadoghq-browser-agent.com | | 0 |
| 81a0a36d-6af1-4322-a856-0cd2453b... | cdn.cookielaw.org | xhr | 0 |
| n0cafv6vibfE5pqJLBOlzr4cL5GATZRU... | wp-nav-pro.com | gif | 0 |
| otBannerSdk.js | cdn.cookielaw.org | script | 0 |
| search-insights.min.js | cdn.jsdelivr.net | script | 0 |
| entries/?query=%7B%22category_id%... | cdn.contentstack.io | preflight | 0 |
| entries/?query=%7B%22display_page.... | cdn.contentstack.io | preflight | 0 |
| queries?x-algolia-agent=Algolia%20for... | jrq5ug04de-dsn.algolia.net | xhr | 0 |
| sdk.js | cdn.sinch.com | script | 0 |
| script.js | db083d0cbd76.cdn4.forter.com | script | 0 |
| entries/?locale=en-us&include_all=true... | cdn.contentstack.io | preflight | 0 |
| entries/?query=%7B%22display_page.... | cdn.contentstack.io | fetch | 0 |
| entries/?query=%7B%22category_id%... | cdn.contentstack.io | fetch | 0 |

41. The screenshot above shows the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendants' Website at https://www.crocs.com. The screenshot depicts only network traffic occurring ***after*** the user rejected all cookies using the cookie banner. As shown above, despite the user's rejection of **all cookies**, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third-party web domains like www.facebook.com, analytics.tiktok.com, trc-events.taboola.com, and others. As further shown in the right-hand column of the screenshot, the user's browser sent cookies along with those HTTP requests to the third parties. This screenshot demonstrates that Defendants caused third-party cookie data and users' Private Communications to be intercepted by Third Parties, even after consumers declined or rejected all cookies and tracking technologies by clicking or selecting the "Reject All" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all cookies.

42. Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

43. As users interact with the Website, even after clicking or selecting the "Reject All" button in the Crocs Privacy Preferences window, thereby declining or rejecting the use of cookies and similar technologies for personalized content, analytics, and marketing (or advertising), as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are intercepted by third parties, alongside the cookie data. The third-party cookies that Defendants wrongfully allow to be stored on users' devices and browsers, and to be intercepted by the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party

cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

44. The Third-Party code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

### C. The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendants' Website.[2]

#### 1. Facebook Cookies.

45. Defendants cause third-party cookies to be transmitted between users' browsers and devices and the **www.facebook.com** domain, even after users elect to "Reject All" cookies and tracking technologies in use on the Website, including all categories of Functional, Analytics, and Advertising cookies (other than those cookies "Necessary" for the Website to function). This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral

[2] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had clicked or selected the "Reject All" button, or had otherwise adjusted individual toggle switches to reject all unnecessary cookies.

analysis, user retargeting, and analytics.[3] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

46. Facebook cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Website causes the following data to be sent to Meta after a user rejects all cookies and later clicks a button on the Website:

POST 200 https://www.facebook.com/tr/

Request Header Query Body Form Cookies Raw | Summary +

| Key | Value |
|---|---|
| :authority | www.facebook.com |
| :method | POST |
| :path | /tr/ |
| :scheme | https |
| accept | text/html,application/xhtml+xml,application/xml;q=0.9,image/avif,image/webp,image/apng,*/*;q=0.8,application/signed-exchange;v=b3;q=0.7 |
| accept-encoding | gzip, deflate, br, zstd |
| accept-language | en-US,en;q=0.9 |
| cache-control | max-age=0 |
| content-length | 6230 |
| content-type | application/x-www-form-urlencoded |
| cookie | datr=pB-8aXhn4Rdl0TWssA9Oc8N_; ps_n=1; sb=8YK9acxXF4VftW1i_aYdmtQG; c_user=1178880062; dpr=1; fr=183elZETyenq06aO9.AWcmcycZImyN33wm4pNGIM4nJ-zAOFhviKODsyTDFn8Zh21ydNk.BqfyqP..AAA.0.0.BqfyqP.AWc95p17mHQjMQhwS0DflrimcWs; xs=15%3AkNYq7NkHXpVZ-w%3A2%3A1776140126%3A-1%3A-1%3A%3AAczo_DtXHRsQ_gCAVIbvxdK3WdoCY324ADS7Z8BxYJes |
| origin | https://www.crocs.com |
| priority | u=0, i |

[3] https://www.facebook.com/privacy/policies/cookies/.

| | |
|---|---|
| referer | https://www.crocs.com/ |
| sec-ch-ua | "Not;A=Brand";v="8", "Chromium";v="150", "Google Chrome";v="150" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "macOS" |
| sec-fetch-dest | iframe |
| sec-fetch-mode | navigate |
| sec-fetch-site | cross-site |
| sec-fetch-storage-access | active |
| sec-fetch-user | ?1 |
| upgrade-insecure-requests | 1 |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/150.0.0.0 Safari/537.36 |
| Host | www.facebook.com |

POST 200 https://www.facebook.com/tr/

Request Header Query Body Form Cookies Raw Summary +

| Key | Value |
|---|---|
| a | tmtealium |
| aems | 0;0 |
| aud[external_id] | 9b02fd1bec6f6e4276eaecde37a0b3a892b5ade42eb6a5bec7ca25acce7b02b8 |
| cd[buttonFeatures] | {"classList":"","destination":"https://www.crocs.com/c/classic-styles/classic-clogs","id":"","imageUrl":"https://media.crocs.com/images/w_270/products/10001_5EP_ALT100/crocs","innerText":"Classic","numChildButtons":0,"tag":"a","type":null,"name":""} |
| cd[buttonText] | Classic |
| cd[formFeatures] | [] |
| cd[pageFeatures] | {"title":"Clogs,+Sandals,+Sneakers+&+Jibbitz+-+Come+As+You+Are+\|+Crocs+-+Shop+the+Crocs+site+for+the+latest+collabs,+new+arrivals,+and+your+favorite+classic+style+-+get+Free+Shipping+on+qualifying+orders.+Sign+up+for+Crocs+Club+&+get+15%+off.+"} |
| cdl | API_unavailable |
| coo | false |
| cs_est | true |
| cud[external_id] | ***^^****^##^^^^****^#**^#**# |
| dl | https://www.crocs.com/ |
| ec | 4 |
| eid | ob3_plugin-set_a574573a6001babd51fa835436275d6579ae77641f0ceece565132f8d9db38c0 |
| es | automatic |
| ev | SubscribedButtonClick |

| | |
|---|---|
| expv2[0] | pl1 |
| expv2[1] | el2 |
| expv2[10] | pc1 |
| expv2[11] | gs1 |
| expv2[12] | zs1 |
| expv2[13] | cp3 |
| expv2[14] | es3 |
| expv2[15] | ac3 |
| expv2[16] | so3 |
| expv2[17] | wc3 |
| expv2[18] | la3 |
| expv2[19] | sf1 |
| expv2[2] | bc1 |
| expv2[20] | da3 |
| expv2[21] | io3 |
| expv2[22] | ae3 |
| expv2[23] | sx1 |
| expv2[24] | if3 |
| expv2[25] | fd1 |
| expv2[26] | bg3 |
| expv2[27] | mg3 |
| expv2[28] | kl3 |
| expv2[29] | sg3 |
| expv2[3] | ra2 |
| expv2[30] | mk3 |
| expv2[31] | sn3 |
| expv2[32] | ec3 |
| expv2[33] | mp3 |

| | |
|---|---|
| expv2[34] | ps3 |
| expv2[35] | fx3 |
| expv2[36] | vt3 |
| expv2[4] | rp2 |
| expv2[5] | im0 |
| expv2[6] | hf1 |
| expv2[7] | sd3 |
| expv2[8] | sp3 |
| expv2[9] | ek3 |
| fbp | fb.1.1786733999543.546119431886006476 |
| ic | fbpixel |
| id | 283061001901751 |
| if | false |
| imft | 1 |
| iss | 1 |
| it | 1786734033562 |
| iw | false |
| ler | empty |
| ncud[external_id] | *********##*******#***#**# |
| o | 12318 |
| plt | 583.5 |
| pmd[description] | Shop+the+Crocs+site+for+the+latest+collabs,<br>+new+arrivals,+and+your+favorite+classic+style+-<br>+get+Free+Shipping+on+qualifying+orders.<br>+Sign+up+for+Crocs+Club+&+get+15%+off. |
| pmd[locale] | en |
| r | stable |
| rl | |
| rqm | formPOST |

| | |
|---|---|
| sh | 900 |
| ss | {"page_description":[{"rid":"26088182424213769","v":["Skip+to+main+content\nAccessibility+Statement\nFREE+SHIPPING+on+orders+$34.99++and+FREE+RETURNS+on+all+orders!\nSearch\nMenu\nUp+to+50%+++$2+Singles+&+$7+Jibbitz™+Charms+Packs\nShop+Sale\n*Prices+as+marked\nClassic+Suit,+New+Moves.\nNew+Spider-Man+Styles.\nShop+Spider-Man\nWelcome+to+the+World+of+Crocs\nGO+FULL+NINJA\n\nShop+LEGO®+NINJAGO®\nMen\nWomen\nKids\nSale\nExplore+Our+Classic+Icons\nClassic\nCrafted\nFuzz\nBuckle\nCrocband\nAnimal\nConfetti\nCamo\nShop+All+Classic+Clogs\nMeet+Niles+the+Croc\nLet's+Go!\nI+Choose+You!\nG"]}],"availability":[{"rid":"1011901141783751","v":["in+stock"]}],"event_organizer":[{"rid":"1629017924985688","v":["Order+Status","Returns","Customer+Service"]}],"author_copyright_holder":[{"rid":"1591132611948885","v":["Order+Status","Returns","Customer+Service"]}],"author_publisher":[{"rid":"1459780008371670","v":["Order+Status","Returns","Customer+Service"]}],"author_owner":[{"rid":"2514924792283689","v":["Order+Status","Returns","Customer+Service"]}],"pricing_availability":[{"rid":"1300071425553136","v":["Camo","$44.99","$74.99","$14.99","Crafted","Sanrio","Ninja+Turtles","LEGO®"]}],"entity_brand":[{"rid":"1368438211759347","v":["Sanrio","Ninja+Turtles","All+Brands","LEGO®","NFL","Disney","Super+Mario™","Star+Wars"]},{"rid":"3010319412506114","v":["Ninja+Turtles","Super+Mario™","Disney","All+Brands","Sanrio","Toy+Story","LEGO®","NFL"]}],"variant_manufacturer":[{"rid":"1914258112560760","v":["Ninja+Turtles","Toy+Story","Super+Mario™","LEGO®","All+Brands","Star+Wars","Sanrio","NFL"]},{"rid":"648185331723422","v":["LEGO®","NFL","Star+Wars","Super+Mario™","Ninja+Turtles","All+Brands","Toy+Story","Disney"]},{"rid":"982937974155393","v":["Terms","Terms+of+Use","HEYDUDE","Opens+new+tab","Women","Collaborations+&+Limited+Editions","Classic+Lined+Clog"]}],"pricing_promotion":[{"rid":"1166197245592315","v":["Saturday+State+of+Mind\nShop+Saturday","Crocba |

nd","Customer+Service\n++++++++\n+++++++++
+Contact+Us\n+++++++++
+Order+Status+&+Returns\n++++++++++FAQs\n+++
+++++++Size+Help\n++++++++++Accessibility\n+++
+++++++Caring+for+your+Crocs\n+++++++++
+Warranty+Information","Company\n++++++++\n+++
+++++++About+Crocs\n++++++++++HEYDUDE\n+++
+++++++Sustainability\n+++++++++
+Comfort+for+the+Planet\n+++++++++
+Comfort+for+All+People\n+++++++++
+Comfort+for+Our+Communities\n+++++++++
+Careers\n++++++++++Investor+Relations\n+++++++
+++Custom+Group+Orders\n+++++++++
+Wholesale+Inquiries","Crocs™+Refresh\n$6.99","$2
0.00","Join+Crocs+Club+&+Get+15%
+Off+Your+Next+Purchase","Bold+Buckle.
+Same+Icon\nShop+Metallic+Buckle+Ballet+Flat"]}]}

| | |
|---|---|
| ss_rks | {"currency":{"tv":2,"rules":{"1661373455151944":1,"4370560789860348":1}}} |
| sw | 1440 |
| tm | 3 |
| ts | 1786734074330 |
| tz | -240 |
| ud[external_id] | 9b02fd1bec6f6e4276eaecde37a0b3a892b5ade42eb6a5bec7ca25acce7b02b8 |
| v | 2.9.377 |

POST 200 https://www.facebook.com/tr/

Request Header Query Body Form Cookies Raw Summary +

| Key | Value |
|---|---|
| c_user | 1178880062 |
| datr | pB-8aXhn4RdI0TWssA9Oc8N_ |
| dpr | 1 |
| fr | 183elZETyenq06aO9.AWcmcycZlmyN33wm4pNGlM4nJ-zAOFhviKODsyTDFn8Zh21ydNk.BqfyqP..AAA.0.0.BqfyqP.AWc95p17mHQjMQhwS0DflrimcWs |
| ps_n | 1 |
| sb | 8YK9acxXF4VftW1i_aYdmtQG |
| xs | 15%3AkNYq7NkHXpVZ-w%3A2%3A1776140126%3A-1%3A-1%3A%3AAczo_DtXHRsQ_gCAVlbvxdK3WdoCY324ADS7Z8BxYJes |

47. The "ev" parameter is short for "event." In this instance, the event is a "SubscribedButtonClick."

48. The "dl" parameter is the "Document Location." It tells Meta the specific webpage on which the event occurred—in this case, https://www.crocs.com.

49. The "ss" parameter contains a detailed description of the contents of the page and discloses to Meta the exact Crocs item the user was viewing.

50. The "ts" parameter corresponds to a "Timestamp," and tells Meta the exact time—down to the millisecond—at which the user viewed the page.

51. The "fbp" parameter is the Facebook Browser ID, and is used to track the user's activity across the Internet.

52. The "sw" and "sh" parameters stand for "screen width" and "screen height," and correspond to the display the user was viewing when the event was recorded.

53. The "c_user" cookie shown above enables Meta to identify a specific user when they are logged in to their account. The "c_user" cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Meta to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Meta uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

54. In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to show relevant ads to those users when they visit other websites within Meta's ad network.[4] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[5]

---

[4] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.

[5] https://allaboutcookies.org/what-data-does-facebook-collect.

55. The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data, including location information derived from IP addresses, such as whether a user is located in California.[6]

56. Further, as shown above, the Meta software code that Defendants cause to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Meta. The "user-agent" corresponds to the device, operating system, and browser that the user has used to access the Website.

57. Finally, the data sent to Meta includes the user's IP address, enabling Meta to determine the user's geolocation, including whether they are located in California.

58. Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) Ad Targeting and Retargeting, in which Meta uses the facebook.com cookies to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) Conversion Tracking, in which Meta uses the facebook.com cookies to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) Audience Insights and Analytics, in which Meta uses the facebook.com cookies to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) Cross-Device and Cross-Platform Tracking, in which Meta uses the facebook.com cookies to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

[6] *Id.*

**2. TikTok Cookies.**

59. Defendants also cause third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Reject All" cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok USDS Joint Venture LLC. The TikTok social media platform is used to create and share short-form videos, and TikTok utilizes cookies for various purposes, including to assist brands and marketers in creating, managing, and optimizing ad campaigns on the platform.[7]

60. TikTok utilizes cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies, including the Website. These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[8] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate user behavior.

61. These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[9]

---

[7] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[8] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[9] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

62. For example, the TikTok software code that Defendants cause to be stored on and executed by a Website user's device causes the following data to be sent to TikTok's domain, at analytics.tiktok.com:



POST 200 https://analytics.tiktok.com/api/v2/pixe

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| :authority | analytics.tiktok.com |
| :method | POST |
| :path | /api/v2/pixel/act |
| :scheme | https |
| accept | */* |
| accept-encoding | gzip, deflate, br, zstd |
| accept-language | en-US,en;q=0.9 |
| content-length | 2261 |
| content-type | text/plain;charset=UTF-8 |
| cookie | ttwid=1%7CR94TdyE15KfmdEmozl49RAroWXb24G6FH3kS3BYBLnM%7C1775068294%7Ce5eed9c1af47cb9e83d5fae6f082b2404dcf1156d19ff013115616099891afa7; _ttp=3Dlt48pnw1l1zANXycpXyrmrNpt |
| origin | https://www.crocs.com |
| priority | u=4, i |
| referer | https://www.crocs.com/ |
| sec-ch-ua | "Not;A=Brand";v="8", "Chromium";v="150", "Google Chrome";v="150" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "macOS" |
| sec-fetch-dest | empty |
| sec-fetch-mode | no-cors |
| sec-fetch-site | cross-site |
| sec-fetch-storage-access | active |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/150.0.0.0 Safari/537.36 |
| Host | analytics.tiktok.com |

POST 200 https://analytics.tiktok.com/api/v2/pi

Request Header Query Body Cookies Raw Summary + PLAIN


```
{
  "event_id": "",
  "message_id": "messageId-1786734070060-5505112107898",
  "is_onsite": false,
  "timestamp": "2026-08-14T19:01:10.060Z",
  "context": {
    "ad": {
      "sdk_env": "external",
      "jsb_status": 2
    },
    "device": {
      "platform": "pc"
    },
    "user": {
      "anonymous_id": "01M00TAE6K4EXXS1GM54HZ1XFT_.tt.1"
    },
    "pixel": {
      "code": "C0UJFC6F998V43B9CQH0",
      "runtime": "1",
      "codes": "C0UJFC6F998V43B9CQH0"
    },
    "page": {
      "url": "https://www.crocs.com/",
      "referrer": "",
      "load_progress": "2"
    },
    "library": {
      "name": "pixel.js",
      "version": "2.2.1"
    },
```

```
    "session_id":
    "6d1be92e-9812-11f1-bd33-5eb141ce496c::vT_c3CRxYenLPd
    9xnmd1",
    "pageview_id":
    "6d1be92e-9812-11f1-bd33-5eb141ce496c-Rc0JY.0.
    0::6d1bd760-9812-11f1-bd33-5eb141ce496c",
    "variation_id": "default",
    "userAgent": "Mozilla/5.0 (Macintosh; Intel Mac OS X
    10_15_7) AppleWebKit/537.36 (KHTML, like Gecko)
    Chrome/150.0.0.0 Safari/537.36",
    "index": 0,
    "sessions": [
      {
        "csid": "1786734000341::ULxG2npC3UxIrMXnpWzs",
        "page_csid":
        "1786734000342::ZvtjHT2Cn4nu41lIpUV4",
        "csct": 1,
        "pixel_code": "C0UJFC6F998V43B9CQH0"
      }
    ]
  },
  "_inspection": {
    "ppf": [
      {
        "id": 10,
        "d": 600
      },
      {
        "id": 12,
        "d": 0
      },
      {
        "id": 10,
        "d": 1200
      },
      {
```

```
          "id": 12,
          "d": 0
        },
        {
          "id": 10,
          "d": 1700
        },
        {
          "id": 12,
          "d": 0
        }
      ],
      "vids": "",
      "inter_id": "1.32097.33741::69712.3.448.553::52857.2.
      0"
    },
    "properties": {},
    "partner": "Tealium",
    "signal_diagnostic_labels": {
      "raw_email": {
        "label": "missing"
      },
      "raw_auto_email": {
        "label": "missing"
      },
      "raw_phone": {
        "label": "missing"
      },
      "raw_auto_phone": {
        "label": "missing"
      },
```

```
    "hashed_email": {
      "label": "missing"
    },
    "hashed_phone": {
      "label": "missing"
    },
    "raw_eb_email": {
      "label": "missing"
    },
    "raw_eb_phone": {
      "label": "missing"
    },
    "hashed_eb_email": {
      "label": "missing"
    },
    "hashed_eb_phone": {
      "label": "missing"
    }
  },
  "action": "Click",
  "auto_collected_properties": {
    "page_trigger": "Click",
    "trigger_element": {
      "tag": "IMG",
      "attributes": {
        "class": "ok-spotlight__lockup"
      },
      "inner_text": "",
      "xpath": "/HTML/body[1]/div[4]/div[1]/div[2]/div
      [1]/div[1]/div[1]/div[1]/div[1]/picture[1]/img[1]",
      "num_child_buttons": 0,
```

```
        "timestamp": "2026-08-14T19:01:10.055Z",
        "position": {
          "x": 345,
          "y": 537.234375
        },
        "image_url": "https://media.crocs.com/images/marketing/2026_S3_Ninjago_Global-Creative_Onsite_LP-Splah-Lockup_GLBL/Crocs",
        "filter_version": "v2"
      },
      "intent_data": [
        {
          "image_url": "https://media.crocs.com/images/marketing/2026_S3_Ninjago_Global-Creative_Onsite_LP-Splah-Lockup_GLBL/Crocs",
          "from": "composedPath",
          "inner_text": ""
        }
      ]
    }
  }
```

POST 200 https://analytics.tiktok.com/api/v2/pixe

Request Header Query Body Cookies Raw Summary +

| Key | Value |
| --- | --- |
| _ttp | 3DIt48pnw1l1zANXycpXyrmrNpt |
| ttwid | 1%7CR94TdyE15KfmdEmozI49RAroWXb24G6FH3kS3BYBLnM%7C1775068294%7Ce5eed9c1af47cb9e83d5fae6f082b2404dcf1156d19ff013115616099891afa7 |


63. The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior during a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[10]

64. The data further includes, among other things, 'intent_data,' showing the URL of the image associated with the page the user was viewing, which in this example related to the Crocs Ninjago product.

65. As shown above, the TikTok software code that Defendants cause to be stored on and executed by the user's device causes the "_ttp" cookie to be sent to TikTok's domain.

[10] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[11]

66. Further, as shown above, the TikTok software code that Defendants cause to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok. The "user-agent" corresponds to the device, operating system, and browser that the user has used to access the Website.

67. Finally, the data sent to TikTok includes the user's IP address, enabling TikTok to determine the user's geolocation, including whether they are located in California.

68. By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyzing user responses to ads and content).[12]

69. Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. TikTok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[13]

**3. Taboola Cookies.**

70. Defendants cause third-party cookies to be transmitted between Website users' browsers and devices and the **trc-events.taboola.com** domain, even after users click or select

---

[11] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[12] *Id.*
[13] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

the "Reject All" button. This domain is associated with Taboola, Inc., "one of the world's leading performance advertising platforms for the open web. Through our exclusive partnerships with many of the world's top websites, we help advertisers engage with over 600 million unique daily active users."[14] "Taboola's platform is powered by Deep Learning technology that uses Taboola's unique data about people's interests and information consumption to recommend the right content to the right person at the right time."[15] Taboola's technology learns user engagement patterns by analyzing data it collects using cookies about user "reading preferences, browsing history, device, location, time of day and more..."[16]

71. Taboola cookies enable it to obtain and store at least the following user data: browsing history, visit history, website interactions, user input data (such as email addresses), demographic information (such as gender and age), interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers (i.e., "cookie IDs"), and/or geolocation data.[17] This data allows Defendants to target their advertising campaigns to users based on user "location, time, browser type, connection type, audience segments, and more."[18]

72. For example, the Taboola software code that Defendants cause to be stored on and executed by the Website user's device causes the following data to be sent to Taboola's domain, at trc-events.taboola.com:

---

[14] *See* https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works#.
[15] *Id.*
[16] *Id.*
[17] Taboola Privacy Policy (available at https://www.taboola.com/policies/privacy-policy#information-we-collect-from-users-user-information); *see also* Taboola Cookie Policy (available at https://www.taboola.com/policies/cookie-policy).
[18] *See* https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works#; *see also* https://help.taboola.com/hc/en-us/articles/115001936293-Targeting-Marketplace-Audiences#.

GET
204

https://trc-events.taboola.com/1696307/log/3/uni
msa=4030&rv=1&tim=1786734069990&vi=1786734033141
1d-a52d-901fa964b8dd-tuct10b5d1c4_1786734003_178
AA&ui=160d6440-3cb5-431d-a52d-901fa964b8dd-tuct1

**Request** Header Query Body Cookies Raw | Summary +

| Key | Value |
| --- | --- |
| :authority | trc-events.taboola.com |
| :method | GET |
| :path | /1696307/log/3/unip?en=pre_d_eng_tb&tos=45456&scd=0&ssd=1&est=1786734003650&ver=36&isls=true&src=i&invt=10000&msa=4030&rv=1&tim=1786734069990&vi=1786734033141&ri=80395f85fee88dcb1bb31d3a8e333a25&sd=v2_509f84e0fc97e75faf2797e35c944643_160d6440-3cb5-431d-a52d-901fa964b8dd-tuct10b5d1c4_1786734003_1786734033_Cli3jgYQs8RnGPXxlo2ANCACKAMw4QE4kaQOQluwDkjty9kDUKcGWABgAGjOyOy29-SsrUhwAYABAlgBAJABAA&ui=160d6440-3cb5-431d-a52d-901fa964b8dd-tuct10b5d1c4&ref=null&cv=20260811-35-RELEASE&item-url=https%3A%2F%2Fwww.crocs.com%2F&it=JS_PIXEL |
| :scheme | https |
| accept | */* |
| accept-encoding | gzip, deflate, br, zstd |
| accept-language | en-US,en;q=0.9 |
| attribution-reporting-eligible | trigger;navigation-source;event-source |
| attribution-reporting-support | web=os |
| cookie | t_gid=160d6440-3cb5-431d-a52d-901fa964b8dd-tuct10b5d1c4; taboola_vmp=temurtbnative-network; datadome=TuMCCvG5LI5LjNr9cr1j5AgN3CNq0PrezC9IDmTAX_5plOqbRicyz_xtNwJOspnNcxzEnAKN_9sTCaHkoGGmyX3bEfUQ4UQ95~RYLa_SFbw8vgGUekTfYVr_AgT82a5S; t_pt_gid=160d6440-3cb5-431d-a52d-901fa964b8dd-tuct10b5d1c4 |

| | |
|---|---|
| origin | https://www.crocs.com |
| priority | u=1, i |
| referer | https://www.crocs.com/ |
| sec-ch-ua | "Not;A=Brand";v="8", "Chromium";v="150", "Google Chrome";v="150" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "macOS" |
| sec-fetch-dest | empty |
| sec-fetch-mode | cors |
| sec-fetch-site | cross-site |
| sec-fetch-storage-access | active |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/150.0.0.0 Safari/537.36 |
| Host | trc-events.taboola.com |

GET
204

https://trc-events.taboola.com/1696307/log/3/uni
msa=4030&rv=1&tim=1786734069990&vi=1786734033141
1d-a52d-901fa964b8dd-tuct10b5d1c4_1786734003_178
AA&ui=160d6440-3cb5-431d-a52d-901fa964b8dd-tuct1

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| cv | 20260811-35-RELEASE |
| en | pre_d_eng_tb |
| est | 1786734003650 |
| invt | 10000 |
| isls | true |
| it | JS_PIXEL |
| item-url | https://www.crocs.com/ |
| msa | 4030 |
| ref | null |
| ri | 80395f85fee88dcb1bb31d3a8e333a25 |
| rv | 1 |
| scd | 0 |
| sd | v2_509f84e0fc97e75faf2797e35c944643_160d6440-cb5-431d-a52d-901fa964b8dd-tuct10b5d1c4_1786734003_1786734033_Cli3jgYQs8I nGPXxlo2ANCACKAMw4QE4kaQOQIuwDkjty9kDUKcGW ABgAGjOyOy29-SsrUhwAYABAIgBAJABAA |
| src | i |
| ssd | 1 |
| tim | 1786734069990 |
| tos | 45456 |
| ui | 160d6440-3cb5-431d-a52d-901fa964b8dd-tuct10b5d1c4 |
| ver | 36 |
| vi | 1786734033141 |




73. Taboola explains in its Privacy Policy the user data it receives from cookies installed on its customers' websites (such as Defendants' Website) and how it uses (and monetizes) that data to create audience segments as follows:

> We use User Information for the following purposes: … **Offering our Customers data segments that help target content and advertisements for topics, products, and services that may interest you.** A data segment is a grouping of users who share one or more attributes (e.g., travel enthusiasts). We offer a number of data segments, both proprietary and from our data partners, to our Customers so that they may better target Users who are more likely to be interested in their content and advertisements. Taboola does not knowingly create segments that are based upon what we consider to be sensitive information (for example, Personal Data revealing your racial or ethnic origin or your religious affiliations, or Personal Data concerning your sensitive health information, sex life or sexual orientation, or genetic or biometric data). In connection with our Services, our Customers may use these standard health-related segments about non-sensitive conditions such as an inferred interest in health and wellness or over the counter medications. In addition, Taboola offers our Customers standard political-related segments that may indicate general political sentiment, interest in specific political issues, and political party affiliation.[19]

74. According to Taboola documentation, the "t_gid" cookie "[a]ssigns a unique, User ID that Taboola uses for attribution and reporting purposes, and to tailor recommendations

[19] Taboola Privacy Policy (available at https://www.taboola.com/policies/privacy-policy#information-we-collect-from-users-user-information) (emphasis in original).

to this specific user based on interactions with an advertiser or publisher."[20] The cookie remains on the consumer's device and does not expire for an entire year.[21]

**4. Snapchat Cookies.**

75. Defendants also cause third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Reject All" cookies, to and from the **tr.snapchat.com** domain. This subdomain is associated with Snap Inc., the social media company that owns Snapchat. Snapchat is a multimedia messaging app that lets users share photos, videos, text, and drawings—often designed to disappear after being viewed. Snapchat uses tr.snapchat.com cookies to collect data on browsing history, choices, and interactions with advertisements.[22] This data helps Snap personalize ad content and track users across the internet.[23] As Snap explains, it uses the data collected by Snapchat cookies "for optimization, custom audience creation, look-alike modeling, reporting, machine learning, and targeting capabilities. All uses are … meant to deliver better results for our ad products."[24]

76. Snapchat cookies allow Snap to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, including age and location,[25] (v) user input data, including name and email address,[26] (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and/or (xii) geolocation data, including whether a user is located in California.

---

[20] https://www.taboola.com/policies/cookie-policy.

[21] *See id.*

[22] https://snapdiscoveries.com/what-is-tr-snapchat-com-is-used-for; *see also* Snapchat Business Help Center: Directly Implement the Pixel On Your Website (available at https://businesshelp.snapchat.com/s/article/pixel-direct-implementation).

[23] *Id.*

[24] Snapchat Business Help Center: Pixel Implementation FAQ (available at https://businesshelp.snapchat.com/s/article/snap-pixel-faq); *see also* Snapchat Business Help Center: About Snap Pixel (available at https://businesshelp.snapchat.com/s/article/snap-pixel-about).

[25] *See* Snap for Developers: Parameters (available at https://developers.snap.com/api/marketing-api/Conversions-API/Parameters).

[26] *Id.*

**5. LinkedIn Cookies.**

77. Defendants also cause third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Reject All" cookies, to and from the **px.ads.linkedin.com** domain, which is owned by LinkedIn Corporation—a subsidiary of Microsoft Corp. LinkedIn Corporation runs the social media-based business networking platform LinkedIn. Cookies set by the linkedin.com domain are used to target website users with advertising.[27] Specifically, cookies set by the linkedin.com domain target users with advertising and measure the performance of such ads.[28] These cookies assign a unique ID to users' devices, which allows LinkedIn to track users across the internet, and to collect information regarding IP address, operating system, browser information, web browsing activity—including the URL of both the site the users came from before accessing the website with the linkedin.com cookies and the one to which users navigate when they leave the website with the linkedin.com cookies—download and purchase activity, and how users interact with ads.[29] Cookies set by the linkedin.com domain are used to target users with advertisements on and off the LinkedIn social media platform.[30]

78. These cookies allow LinkedIn to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D. The Third Parties Intercept User Communications While in Transit.**

79. On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendants' Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is

---

[27] https://cookiepedia.co.uk/host/linkedin.com.
[28] https://www.linkedin.com/legal/cookie-policy.
[29] *Id.*
[30] *Id.*

committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

80. First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

81. Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: directly from the user's device and separately through a server-to-server API, to ensure reliability.[31] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action.[32] This deduplication occurs as the communications are received, before they are stored.

82. Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

83. Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be

[31] For example, Facebook's is the **Meta Conversions API**. TikTok uses the **TikTok Events API**. Snapchat's is the **Snapchat Conversions API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

[32] For example, Facebook recommends that websites use a "redundant setup" whereby "advertisers implement the Conversions API alongside their Meta Pixel." *See* "Handling Duplicate Pixel and Conversions API Events," available at https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events. Facebook confirms that its system automatically deduplicates events using various parameters included with the data, such as "event_id," "event_name," "fbp," and "external_id." *Id.*

taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

84. To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

85. For example, Meta (formerly Facebook) has publicly described its proprietary real-time stream processing platform that ingests data transmitted from users' devices and websites, applies real-time transformations and personalization, and only thereafter stores the data in backend data warehouses, as illustrated in the following diagram created by Meta:[33]




[33] XStream: Stream Processing Platform at Facebook (video) at 1:07 (available at https://www.youtube.com/watch?v=DNI54vc1ALQ).

86. As the diagram confirms, the data is sent from consumers' "Devices" and from the "Web," and then goes through the Stream Processing Pipelines ***before*** being stored in the data "Warehouse."

87. Meta's Stream Processing Pipelines perform a wide variety of real-time analytics, transformations, and AI and machine learning on the data prior to storage:[34]




88. As the diagram confirms, Meta does not merely store incoming data for later review; rather, before the data is stored, Meta contemporaneously reads and processes it—including by reading the data, cleaning it, applying "real-time personalization" to associate it with a particular user, and analyzing its contents as necessary to generate real-time responses.

89. On information and belief, the other Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage.

90. Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and

[34] *Id.* at 2:05.

analyzing in real time while those communications are in transit between the user's browser and Defendants' Website.

**E. The Signaling and Addressing Information Intercepted by the Third Parties.**

91. The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class Members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiffs' or Class Member's IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class Members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

92. The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class Members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

93. Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep

the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and Website users' communications, separate from any underlying user input or message content.

94. Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and Website users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

**F. The Private Communications Collected are Valuable.**

95. As part of their regular course of business, Defendants target California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendants' and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendants cause to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendants knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

96. The Private Communications tracked and collected through cookies on the Website are valuable to Defendants and the Third Parties. Defendants use this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendants can identify

California users who visit webpages related to particular shoes or sandals and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites.

97. Data reflecting users' browsing activity allows Defendants to identify behavioral patterns, preferences, and interests relating to Defendants' products. At scale, this data enables Defendants to assess trends across their brand and within the broader casual footwear market. Defendants monetize this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

98. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[35] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

99. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

100. By falsely representing consumers' ability to reject unnecessary cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendants unjustly enrich themselves at the expense of consumer privacy and autonomy. Defendants deprive consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Mary Brown**

101. Plaintiff Brown visited the Website to seek and obtain information about Crocs products, while located in California, on one or more occasions during the last four years.

[35] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

102. Plaintiff Brown's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendants' products. Specifically, Plaintiff Brown is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendants' privacy practices.

103. When Plaintiff Brown visited the Website, it immediately detected that she was a visitor in California and presented her with Defendants' popup cookie consent banner, which provided the option to select the "your privacy choices" link. Plaintiff Brown viewed Defendants' representation on the popup cookie consent banner that, "We use technology on this site that collects data from and about you, which we and our vendors may use to provide, improve, and personalize our products and services, for analytics and marketing, to record site interactions and to fulfill your requests. We also may share or make accessible your data to third parties, such as marketing vendors, social media companies, and research partners. In some states, this may constitute 'targeted advertising,' 'selling,' or 'sharing' as defined by applicable laws." Plaintiff Brown also viewed Defendants' additional representation that users could receive more information on their privacy choices by clicking or selecting the "your privacy choices" link.

104. Plaintiff Brown selected and clicked the "your privacy choices" link, which caused Defendants' Crocs Privacy Preferences window to appear. There, Plaintiff Brown viewed Defendants' additional representations that, "Because we respect your right to privacy, you can choose not to allow some types of cookies. Click on the different category headings to find out more and change your default settings." Along with these representations, Plaintiff Brown saw that she could choose to "Reject All" cookies, including all categories of Functional, Analytics, and Advertising cookies (other than those cookies "Necessary" for the Website to function), either by clicking or selecting the button to do so, or by otherwise adjusting the available switches.

105. Accordingly, Plaintiff Brown then selected and clicked the "Reject All" button. Plaintiff Brown believed that selecting the "Reject All" button on the Crocs Privacy Preferences window found on the Website would allow her to opt out of, decline, and/or reject "All"

unnecessary cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party marketing vendors, social media companies, and research partners for the purposes of providing personalized content, analytics, and marketing or advertising).

106. In selecting the "Reject All" button, Plaintiff Brown gave Defendants notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Brown specifically rejected, based on Defendants' representations, those cookies used to "collect data from and about [users]…to provide, improve, and personalize [Defendants'] products and services, for analytics and marketing, [and] to record site interactions" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Brown continue browsing the Website.

107. Even before the popup cookie consent banner and Crocs Privacy Preferences window appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for personalized content, analytics, and marketing (or advertising), to be placed on Plaintiff Brown's device and/or intercepted by the Third Parties along with user data, without Plaintiff Brown's knowledge. Accordingly, the popup cookie consent banner's and Crocs Privacy Preferences window's representations to Plaintiff Brown that she could reject the use and/or placement of "All" unnecessary cookies and tracking technologies while she browsed the Website were false. Contrary to what Defendants made Plaintiff Brown believe, she did not have a choice about whether third-party cookies would be placed on her device and/or intercepted by the Third Parties along with her user data; rather, Defendants had already caused that to happen.

108. Then, as Plaintiff Brown continued to browse the Website in reliance on the promises Defendants made in the cookie consent banner and Crocs Privacy Preferences window, and despite Plaintiff Brown's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, analytics, and marketing (or advertising) from the Third Parties on her device. In doing

so, Defendants permitted the Third Parties to track and collect Plaintiff Brown's Private Communications as Plaintiff Brown browsed the Website.

109. Defendants' representations that consumers could "Reject All" unnecessary cookies while Plaintiff Brown and users browsed the Website, or at least those involved in providing personalized content, analytics, and marketing (or advertising), were untrue. Had Plaintiff Brown known this fact, she would not have used the Website. Moreover, Plaintiff Brown reviewed the popup cookie consent banner and Crocs Privacy Preferences window prior to using the Website. Had Defendants disclosed that they would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject "All" unnecessary cookies, Plaintiff Brown would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

110. Plaintiff Brown continues to desire to browse content featured on the Website. Plaintiff Brown would like to browse websites that do not misrepresent that users can reject all unnecessary cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all unnecessary cookies and tracking technologies, Plaintiff Brown would likely browse the Website again in the future, but will not do so until then. Plaintiff Brown regularly visits websites that feature content similar to that of the Website. Because Plaintiff Brown does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all unnecessary cookies and tracking technologies, Plaintiff Brown will be unable to rely on Defendants' representations when browsing the Website in the future absent an injunction that prohibits Defendants from making misrepresentations on the Website. The only way to determine what network traffic is intercepted by third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Brown is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Estrella Eugenio**

111. Plaintiff Eugenio visited the Website to seek and obtain information about Crocs products, while located in California, on one or more occasions during the last four years.

112. Plaintiff Eugenio's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendants' products. Specifically, Plaintiff Eugenio is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendants' privacy practices.

113. When Plaintiff Eugenio visited the Website, it immediately detected that she was a visitor in California and presented her with Defendants' popup cookie consent banner, which provided the option to select the "your privacy choices" link. Plaintiff Eugenio viewed Defendants' representation on the popup cookie consent banner that, "We use technology on this site that collects data from and about you, which we and our vendors may use to provide, improve, and personalize our products and services, for analytics and marketing, to record site interactions and to fulfill your requests. We also may share or make accessible your data to third parties, such as marketing vendors, social media companies, and research partners. In some states, this may constitute 'targeted advertising,' 'selling,' or 'sharing' as defined by applicable laws." Plaintiff Eugenio also viewed Defendants' additional representation that users could receive more information on their privacy choices by clicking or selecting the "your privacy choices" link.

114. Plaintiff Eugenio selected and clicked the "your privacy choices" link, which caused Defendants' Crocs Privacy Preferences window to appear. There, Plaintiff Eugenio viewed Defendants' additional representations that, "Because we respect your right to privacy, you can choose not to allow some types of cookies. Click on the different category headings to find out more and change your default settings." Along with these representations, Plaintiff Eugenio saw that she could choose to "Reject All" cookies, including all categories of Functional, Analytics, and Advertising cookies (other than those cookies "Necessary" for the Website to function), either by clicking or selecting the button to do so, or by otherwise adjusting the available toggle switches.

115. Accordingly, Plaintiff Eugenio then selected and clicked the "Reject All" button. Plaintiff Eugenio believed that selecting the "Reject All" button on the Crocs Privacy Preferences window found on the Website would allow her to opt out of, decline, and/or reject "All" unnecessary cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party marketing vendors, social media companies, and research partners for the purposes of providing personalized content, analytics, and marketing or advertising).

116. In selecting the "Reject All" button, Plaintiff Eugenio gave Defendants notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Eugenio specifically rejected, based on Defendants' representations, those cookies used to "collect data from and about [users]…to provide, improve, and personalize [Defendants'] products and services, for analytics and marketing, [and] to record site interactions" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Eugenio continue browsing the Website.

117. Even before the popup cookie consent banner and Crocs Privacy Preferences window appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for personalized content, analytics, and marketing (or advertising), to be placed on Plaintiff Eugenio's device and/or intercepted by the Third Parties along with user data, without Plaintiff Eugenio's knowledge. Accordingly, the popup cookie consent banner's and Crocs Privacy Preferences window's representations to Plaintiff Eugenio that she could reject the use and/or placement of "All" unnecessary cookies and tracking technologies while she browsed the Website were false. Contrary to what Defendants made Plaintiff Eugenio believe, she did not have a choice about whether third-party cookies would be placed on her device and/or intercepted by the Third Parties along with her user data; rather, Defendants had already caused that to happen.

118. Then, as Plaintiff Eugenio continued to browse the Website in reliance on the promises Defendants made in the cookie consent banner and Crocs Privacy Preferences window, and despite Plaintiff Eugenio's clear rejection of the use and/or placement of such cookies and

tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, analytics, and marketing (or advertising) from the Third Parties on her device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff Eugenio's Private Communications as Plaintiff Eugenio browsed the Website.

119. Defendants' representations that consumers could "Reject All" unnecessary cookies while Plaintiff Eugenio and users browsed the Website, or at least those involved in providing personalized content, analytics, and marketing (or advertising), were untrue. Had Plaintiff Eugenio known this fact, she would not have used the Website. Moreover, Plaintiff Eugenio reviewed the popup cookie consent banner and Crocs Privacy Preferences window prior to using the Website. Had Defendants disclosed that they would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject "All" unnecessary cookies, Plaintiff Eugenio would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

120. Plaintiff Eugenio continues to desire to browse content featured on the Website. Plaintiff Eugenio would like to browse websites that do not misrepresent that users can reject all unnecessary cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all unnecessary cookies and tracking technologies, Plaintiff Eugenio would likely browse the Website again in the future, but will not do so until then. Plaintiff Eugenio regularly visits websites that feature content similar to that of the Website. Because Plaintiff Eugenio does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all unnecessary cookies and tracking technologies, Plaintiff Eugenio will be unable to rely on Defendants' representations when browsing the Website in the future absent an injunction that prohibits Defendants from making misrepresentations on the Website. The only way to determine what network traffic is intercepted by third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training

enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Eugenio is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

121. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed the Website in the State of California after clicking or selecting the "Reject All" button in the Crocs Privacy Preferences window, or who otherwise adjusted the available toggle switches in the Privacy Preference window to reject all unnecessary cookies.

122. This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

123. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

124. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendants would not cause third-party cookies to be placed on their browsers and devices and/or intercepted by third parties along with user data, after Class members chose to reject all unnecessary cookies and tracking technologies on the Website, nor would Defendants permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

125. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendants' actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

126. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, rejected all unnecessary cookies, and had their confidential Private Communications intercepted by the Third Parties.

127. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendants' liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

128. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult

or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

129. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

130. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendants constituting a serious invasion of privacy.

131. Defendants have intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

132. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendants affirmatively promised users they could "Reject All" unnecessary cookies and tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner and Crocs Privacy Preferences window on the Website, Plaintiffs and Class members rejected unnecessary cookies and reasonably expected that their rejection of unnecessary cookies and tracking technologies would be honored. That is, they reasonably believed that Defendants would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they rejected all such cookies and/or tracking technologies, Defendants would not permit the Third Parties to track and collect

Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

133. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

134. Defendants, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiff's and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

135. Defendants' actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

136. Defendants' intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

137. Defendants lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

138. Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

139. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

140. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of unnecessary cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

141. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

142. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendants intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

143. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions,

user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendants' representations otherwise in the popup cookie consent banner and Crocs Privacy Preferences window, Defendants intentionally intruded upon the solitude or seclusion of Website users. Defendants effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

144. The Third Parties' tracking and collecting of Plaintiff's and Class member's Private Communications on the Website using third-party cookies that Defendants caused to be stored on users' devices—and to be intercepted by Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to "Reject All" unnecessary cookies.

145. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendants' promise that users could "Reject All" unnecessary cookies, as well as state criminal and civil laws designed to protect individual privacy.

146. Defendants' intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendants represented that Website users could "Reject All" unnecessary cookies when, in fact, Defendants caused such third-party cookies to be stored on consumers' devices and browsers, and to be intercepted by third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendants' false representations, that when they rejected all unnecessary cookies and tracking technologies, Defendants would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

147. Defendants' conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

148. Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

149. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

150. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of all unnecessary cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

151. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

152. California Penal Code § 631(a) provides, in pertinent part:

> "Any person [i] who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or [ii] [who] in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

153. Each Defendant is a "person" within the meaning of California Penal Code § 631.

154. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do

not, Defendants' deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

155. Each of the Third Parties is a separate legal entity that offers a software-as-a-service and not merely a passive device. Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendants, on the other.

156. Under § 631(a), Defendants must show they had the consent of all parties to a communication.

157. At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendants willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

158. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

159. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and

activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

160. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

161. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendants' aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject all unnecessary cookies in the Crocs Privacy Preferences window.

162. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendants—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

163. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their

Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

164. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendants' violations of CIPA § 631(a), as well as injunctive relief.

165. Unless enjoined, Defendants will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to casual shoes and sandals. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to reject unnecessary cookies and tracking technologies will be honored and/or whether Defendants will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Further, Defendants have already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants and will continue to do so unless and until enjoined.

**<u>Fourth Cause of Action</u>: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

166. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

167. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the

> continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

168. California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

169. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

170. The Third Parties' cookies and the corresponding software code installed by Defendants on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

171. At all relevant times, Defendants caused pen registers (e.g., the Third-Party software code and cookies) to be placed on Plaintiffs' and Class members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and user-agent information), to be intercepted by the Third Parties.

172. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website.

173. Plaintiffs and Class members did not provide their prior consent to Defendants' use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendants that they did not consent to the Website's use of third-party cookies by clicking the "Reject All" button in the Crocs Privacy Preferences window.

174. Defendants did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

175. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

176. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendants' violations of § 638.51(a).

**<u>Fifth Cause of Action</u>: Common Law Fraud, Deceit and/or Misrepresentation**

177. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

178. Defendants fraudulently and deceptively informed Plaintiffs and Class members that they could "Reject All" unnecessary cookies.

179. However, despite Defendants' representations otherwise, Defendants caused third-party cookies and software code to be stored on consumers' devices, and to be intercepted by the Third Parties alongside Private Communications, even after users clicked or selected the "Reject All" button in the Crocs Privacy Preferences window, or otherwise adjusted the available toggle switches to reject all cookies and tracking technologies in use on the Website, including all categories of Functional, Analytics, and Advertising cookies (other than those cookies "Necessary" for the Website to function). These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "Reject All" unnecessary cookies.

180. Defendants affirmatively chose to deploy a cookie consent banner and a Privacy Preferences window governing the collection, sharing, and use of users' Private Communications on the Website.

181. By implementing the cookie banner and preferences window, Defendants undertook responsibility for ensuring that the banner and window accurately communicated users' privacy choices and properly effectuated those choices.

182. Defendants and/or their agents configured and managed which technologies loaded and transmitted data before and after a user disabled third party cookies, including through consent management settings and/or platforms, tag-management rules, and related implementation choices under Defendants' control. On information and belief, Defendants operated, controlled, configured, approved, or maintained settings that permitted the Third Parties' tracking technologies to continue collecting users' Private Communications even after users selected options indicating their choice to disable and/or reject unnecessary cookies and opt out of the collection, use, sale, and/or sharing of their Private Communications.

183. Industry documentation for the consent management platforms and Third Parties' technologies used on the Website explains that website operators, i.e., Defendants, must affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies. On information and belief, Defendants received, reviewed, or had access to such implementation guidance in deploying the challenged technologies on the Website. On information and belief, Defendants had the ability during the relevant time period to audit, test, configure, disable, or modify, the cookie consent banner, the Crocs Privacy Preferences window, consent-management functionality, and Third-Party tracking technologies operating on the Website. Defendants had information available to them demonstrating that users' purported opt-out selections were not being honored and that users' Private Communications continued to be collected and intercepted by the Third Parties notwithstanding Defendants' contrary representations.

184. Defendants also used the Third Parties' analytics, advertising, and reporting dashboards to monitor Website traffic, user behavior, advertising performance, and related engagement metrics generated through the challenged cookie and tracking technologies. Through these dashboards and related reporting tools, Defendants had access to information reflecting that user data continued to be intercepted by and processed by the Third Parties notwithstanding users' purported opt-out selections. Defendants routinely reviewed, monitored, and relied upon data generated through the Third Parties' resources for advertising, analytics, personalization, attribution, and/or website performance purposes.

185. Industry standards, privacy frameworks, and applicable statutes and regulations, including California's California Consumer Privacy Act and related regulations, require website operators deploying cookie consent banners and privacy preference windows to ensure that consent mechanisms function properly and accurately record and enforce user choices. *See*, *e.g*., California Consumer Privacy Rights Act § 7025(c) (enumerating requirements for businesses that receive an "opt out preference signal."); *id*. § 7101 (business record keeping requirements regarding opt out requests).

186. On information and belief, Defendants either knew their representations regarding users' ability to reject all unnecessary cookies and opt out of data sharing were false, lacked any reasonable basis for believing those representations were, or made those representations carelessly and recklessly despite information available to Defendants demonstrating that users' data continued to be intercepted by the Third Parties after users attempted to opt out.

187. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendants, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendants breached their duty to Plaintiffs and Class members. Defendants also gained financially from, and as a result of, their breach.

188. Plaintiffs and Class members relied to their detriment on Defendants' misrepresentations and fraudulent omissions.

189. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendants' unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the

use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

190. Defendants' actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

191. Defendants' representation that consumers could reject all unnecessary cookies (including those cookies that "collect data from and about [users]…to provide, improve, and personalize [Defendants'] products and services, for analytics and marketing, [and] to record site interactions") if they clicked or selected the "Reject All" button, or otherwise adjusted available toggle switches in the Crocs Privacy Preferences window, was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and Crocs Privacy Preferences window prior to their interactions with the Website. Had Defendants disclosed that they caused third-party unnecessary cookies to be stored on Website visitors' devices that are related to personalized content, analytics, and marketing (or advertising), and/or share information with third parties even after they choose to reject all such unnecessary cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

192. By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendants would not permit third parties to obtain users' Private Communications when consumers chose to reject unnecessary cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

193. Plaintiffs and Class members justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants' conduct.

194. As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

195. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**Sixth Cause of Action: Unjust Enrichment**

196. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

197. Defendants created and implemented a scheme to increase their own profits through a pervasive pattern of false statements and fraudulent omissions.

198. Defendants were unjustly enriched as a result of their wrongful conduct, including through their misrepresentation that users could "Reject All" unnecessary cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected all such cookies.

199. Plaintiffs' and Class members' Private Communications have conferred an economic benefit on Defendant.

200. Defendants have been unjustly enriched at the expense of Plaintiffs and Class members, and Defendants have unjustly retained the benefits of their unlawful and wrongful conduct.

201. Defendants appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendants at their detriment. These benefits

were the expected result of Defendants acting in their pecuniary interest at the expense of Plaintiffs and Class members.

202. It would be unjust for Defendants to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

203. There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

204. Plaintiffs and Class members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

205. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendants as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendants for all damages sustained as a result of Defendants' wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendants to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

Dated: August 21, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*